```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 25, 2009
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GREGORY A. FRASER,                              :
                                                :
             Plaintiff,            :
                                                :   04 Civ. 6958 (PAC)
  - against -                                   :
                                                :   OPINION & ORDER
                                                :
FIDUCIARY TRUST COMPANY                         :
INTERNATIONAL, et al.                           :
                                                :
             Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Gregory A. Fraser ("Fraser") sues Defendants Fiduciary Trust Company International ("Fiduciary"), Franklin Resources Inc. ("Franklin"), and seven individual employees of Fiduciary and Franklin (the "Individual Defendants")[1] on a variety of claims arising out of his termination from Fiduciary in 2003. Fraser's claims have been the subject of two previous decisions, by Judge Richard M. Berman and this Court, which granted several of Defendants' motions to dismiss. See Fraser v. Fiduciary Trust Co. Int'l et al., No. 04 Civ. 6958 (RMB) (GWG), 2005 WL 6328596 (S.D.N.Y. June 23, 2005) (Berman, J.) ("Fraser I"); Fraser v. Fiduciary Trust Co. Int'l et al., 417 F. Supp. 2d 310 (S.D.N.Y. 2006) (Crotty, J.) ("Fraser II"). Fraser now has four causes of action remaining: (1) whistleblower claims pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A; (2) a discriminatory discharge claim pursuant to Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140; (3) racial discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., New York State Human Rights Law

---

[1] The Individual Defendants are Michael Materasso, Jeremy H. Biggs, William Y. Yun, Charles B. Johnson, Anne M. Tatlock, Gregory E. Johnson, and Michael L. Flanagan.

1

("NYSHRL"), N.Y. Exec. L. §§ 290 et seq., and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 et seq.; and (4) a common law breach of contract claim for violation of Fiduciary's employee policy manual.

Defendants move for summary judgment on Fraser's remaining claims. They also move to strike the entire declaration submitted by Fraser and the exhibits attached to the declaration submitted by Fraser's counsel in opposition to the motion for summary judgment. The response is prolix, rambling, relies on irrelevant facts, makes unsupported arguments, and asserts bald legal conclusions. It does not raise a genuine issue of material fact necessitating a trial. Accordingly, Defendants' motion for summary judgment is GRANTED and Fraser's Second Amended Complaint is DISMISSED. Consequently, Defendants' motion to strike is DENIED as moot.[2]

## BACKGROUND

**I.     Facts**

The Court assumes familiarity with the facts of this matter as presented in the previous decisions by Judge Berman and this Court. See Fraser I, 2005 WL 6328596, at *1-*3; Fraser II, 417 F. Supp. 2d at 315-17. What follows is a brief statement of facts relevant to the present motions.[3]

Plaintiff Fraser, an African-American, was employed as a Vice President of Defendant

---

[2] Defendants ask the Court to: (1) strike the declaration submitted by Fraser in opposition to Defendants' motion for summary judgment on the grounds that the declaration consists almost entirely of inadmissible legal or factual conclusions (Def. Mem. in Support of Motion to Strike at 11); and (2) strike the exhibits attached to the declaration of Fraser's counsel because these are not authenticated, irrelevant under the Federal Rules of Evidence, or contain hearsay. (Id. at 11-18.) As discussed at length in this Opinion & Order, Defendants are entitled to judgment as a matter of law on each of Fraser's remaining claims. The Court need not strike or otherwise disregard the declarations submitted by Plaintiff and his counsel in order to reach this conclusion. Consequently, Defendants' motion to strike all or part of these declarations is moot.

[3] The facts in this section are derived from the factual recitations in the prior decisions, as well as from the parties' statements of fact submitted pursuant to Local Rule 56.1 in connection with the present motion for summary judgment. Where useful, the Court provides citations to relevant exhibits.

2

Fiduciary from October 2, 2000 until his termination approximately two-and-a-half years later, on March 7, 2003. Fiduciary is a New York-based investment management company and a wholly-owned subsidiary of Defendant Franklin. Individual Defendant William Y. Yun served as Fiduciary's President. Individual Defendant Michael Materasso was the Head of Domestic Fixed Income Asset Management and was Fraser's direct supervisor.

Upon being hired, Fraser received a copy of Fiduciary's policy manual (the "Policy Manual"). The Policy Manual's "Introduction" section expressly stated that the Policy Manual was not a contract and that Fiduciary employees were terminable at will. (Deposition Transcript of Gregory A. Fraser ("Fraser Dep.") Ex. Q at iv.)[4] In sections entitled "Reporting Illegal Activity" and "Suspicious Activity Reporting," the Policy Manual encouraged employees to report potentially illegal conduct, and assured them that employees who reported such conduct would not be subjected to retaliation. (Id. at 5-6.) The Policy Manual also explained Fiduciary's anti-harassment policy and set forth a procedure for employees to report discriminatory or harassing conduct. (Id. at 27-28.) Fraser received and signed an updated version of the Policy Manual during each year of his employment at Fiduciary.

Fraser alleges that on two instances during his employment he "blew the whistle" on potentially illegal activities at Fiduciary.[5] First, in February 2002, Fiduciary's New York office decided to sell off the WorldCom bonds it held in its ERISA trust accounts. On February 6, 2002, Fraser drafted an e-mail intended for Fiduciary's other offices explaining the New York office's decision. A New York-based portfolio manager, however, instructed him not to send the e-mail. Fiduciary's Los Angeles office retained its WorldCom holdings and, according to Fraser,

---

[4] Relevant excerpts from Fraser's deposition transcript and attached exhibits are attached as Exhibit F to the Declaration of David S. Warner ("Warner Declaration") submitted in support of Defendants' motion for summary judgment.
[5] Initially, Fraser alleged four instances of whistleblowing. Two of these instances were dismissed without prejudice by Judge Berman and, after repleading, were subsequently dismissed with prejudice by this Court. See infra Part II.

3

suffered substantial losses to its accounts when WorldCom defaulted on its debt and filed for bankruptcy. (See Second Amended Complaint ("Second Am. Compl.") ¶ 68.) Three months later, on May 16, 2002, Fraser forwarded a copy of his WorldCom e-mail to Yun. (See Fraser Dep. Ex. K.) He informed Yun that he had drafted the e-mail in February and was prepared to disseminate it to other offices but had been instructed not to do so. (Id.) At no point in his draft e-mail of February 6, 2002 or during any subsequent communications with Yun did Fraser allege that any of Fiduciary's actions with respect to its WorldCom holdings constituted a violation of the law. Nonetheless, Fraser claims that following the May 16, 2002 WorldCom bond e-mail, he was the victim of three retaliatory acts: (1) in May 2002, his desk was moved closer to Materasso's; (2) in June 2002, he was relieved of his responsibility for drafting the Fixed Income Department's client newsletter; and (3) Materasso stopped inviting Fraser to attend Global Investment Committee ("GIC") meetings.

The second alleged instance of whistleblowing occurred in February 2003, when Fraser came across an internal document entitled "Top Ten Relationships By Revenue," which listed United Nations ("UN") pension fund accounts managed by Fiduciary and identified the UN as one of Fiduciary's ten largest relationships by revenue. (Fraser Dep. Ex. M.) The document had not been shown to clients. Fraser believed that the UN pension fund accounts should not have been included in the document because they were not "managed accounts" and the document therefore overstated Fiduciary's Assets Under Management ("AUM"). He told Materasso that Fiduciary should not show the document to clients because it overstated Fiduciary's AUM. Materasso told Fraser that that was how Fiduciary had "always done it," and moved on to other business.

Fraser further alleges that he was subjected to racial discrimination during his

4

employment at Fiduciary. He claims to have been unfairly passed over for a portfolio manager position. During his employment at Fiduciary, although the New York Fixed Income Department did not hire or promote any portfolio managers, the London office promoted a white European, Atanas Christev, to a portfolio manager position in July 2002. In addition, Fraser contends that his colleagues in the New York office made insensitive racial remarks both to him and to other minority employees. Fraser claims that in one instance, Materasso directed a highly offensive racial epithet at him.

In November 2002, Fraser sought, but did not receive, Fiduciary's approval to create and manage a hedge fund. On February 23, 2003, still acting without Fiduciary's approval, Fraser held what attendees later described as a "pitch" for the proposed hedge fund. (See Deposition Transcript of Edward G. Eisert ("Eisert Dep.") at 218:14-19.)[6] On February 28 and March 3, Fraser sent follow-up e-mails about the proposed hedge fund to Fiduciary's portfolio managers, in which he suggested that they promote the fund to Fiduciary's clients. Fiduciary's management became concerned about these activities because they had not approved Fraser's proposed hedge fund, and they opened an investigation into the matter. (Fraser Dep. Exs. I, N.) The investigation was conducted by Edward G. Eisert ("Eisert"), a Fiduciary employee who otherwise had no connection to Fraser's day-to-day employment. Eisert determined that Fraser was promoting an unauthorized hedge fund; he presented his findings to Yun, who concluded that Fraser's conduct warranted dismissal. Fiduciary terminated Fraser's employment on March 7, 2003.

## II.   Procedural History

Fraser filed his original Complaint on August 27, 2004. On December 6, 2004, he filed an Amended Complaint pleading eight causes of action based upon a variety of federal, state,

---

[6] Relevant excerpts from Eisert's deposition transcript are attached as Exhibit C to the Warner Declaration.

and local statutes. Defendants moved to dismiss the Amended Complaint on January 28, 2005. By Decision and Order dated June 23, 2005, Judge Berman dismissed without prejudice Fraser's claims arising under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; Rule 20(a) of the Securities Exchange Act; California state securities law; ERISA § 510's whistleblower provision; and ERISA § 404. Fraser I, 2005 WL 6328596, at *14. Judge Berman also dismissed without prejudice Fraser's common law breach of contract claim and his SOX § 806 whistleblower claims based upon three of his four alleged instances of whistleblowing activity, including the May 16, 2002 WorldCom bond e-mail. Id. In addition, Judge Berman dismissed with prejudice claims arising under Section 15 of the Securities Exchange Act and SOX sections 1102 and 1107. Id. Judge Berman allowed Fraser to proceed with his discriminatory discharge claim under ERISA § 510; SOX § 806 whistleblower claim based upon the UN AUM document; and racial discrimination claims under Title VII, the NYSHRL, and the NYCHRL. Id.

Fraser filed a Second Amended Complaint on August 12, 2005, which Defendants moved to dismiss on October 4, 2005. On February 15, 2006, this Court granted the motion in part and denied it in part. The Court held that Fraser's Second Amended Complaint failed to cure the defects in his claims arising under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; Rule 20(a) of the Securities Exchange Act; California state securities law; ERISA § 510's whistleblower provision; and ERISA § 404. Consequently, it dismissed those claims with prejudice. Fraser II, 417 F. Supp. 2d at 317-21. The Court also held, however, that Fraser's Second Amended Complaint stated a claim for common law breach of contract and for whistleblower protection under SOX § 806 based upon the WorldCom bond e-mail. It therefore reinstated those claims, which had previously been dismissed without prejudice by

6

Judge Berman. Id. at 323-25.

Thus, following the Court's Decision and Order, Fraser was left with the four causes of action presently at issue. On July 25, 2008, Defendants moved for summary judgment.

## DISCUSSION

### III.    Standard of Review for a Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this showing is made, the non-moving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," but must present specific facts demonstrating that there is a genuine issue for trial. Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the non-moving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

**IV.     SOX Whistleblower Claims**

Section 806 of SOX guards employees from retaliation for providing information to their supervisors that they "reasonably believe[] constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission ["SEC"], or any provision of Federal law relating to fraud against shareholders…." 18 U.S.C. § 1514A(a)(1).

As this Court previously explained, "[t]o assert a whistleblower claim under SOX, Fraser 'must show by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew of the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action.'" Fraser II, 417 F. Supp. 2d at 322 (quoting Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1375 (N.D. Ga. 2004)). Fraser's SOX whistleblower claims fail as a matter of law because the two acts upon which his claims are based—his May 16, 2002 e-mail to Yun regarding the WorldCom bonds and his February 2003 conversation with Materasso about the UN AUM document—fail to satisfy this four-part test.

In order to qualify as protected activity, "an employee's complaint must definitively and specifically relate to one of the six enumerated categories" of misconduct contained in SOX § 806, i.e. mail fraud, wire fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to fraud against shareholders. Allen v. Admin. Rev. Bd., 514 F.3d 468, 476-77 (5th Cir. 2008); see also Fraser I, 2005 WL 6328596, at *8 ("Protected activity must implicate the substantive law protected in [SOX] definitively and specifically."). General inquiries do not constitute protected activity. "[I]n order for the whistleblower to be protected by [SOX], the reported information must have a certain degree of

8

specificity….[A] whistleblower must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8, 2004 DOLSOX LEXIS 65, at *33-34 (U.S.D.O.L. June 15, 2004). Moreover, the complaining employee's belief that his employer's conduct violated one of the enumerated categories must be both objectively and subjectively reasonable. Marshall v. Northrup Grumman Synoptics, 2005-SOX-0008, 2005 WL 4889013, at *2 (U.S.D.O.L. June 22, 2005).

Fraser's May 16, 2002 e-mail to Yun regarding the WorldCom bonds does not constitute protected activity. First, the e-mail did not express any specific concern about any fraud enumerated in SOX § 806—it merely indicated that the New York office had decided to sell its WorldCom bonds. Fraser explained to Yun that he was prepared to send the e-mail to other offices in February 2002 and was prevented from doing so, but he never alleged that this amounted to misconduct on the part of his superiors in New York. On its face, then, the e-mail constituted a general inquiry regarding a business decision rather than a specific complaint of fraud. Second, the length of time that elapsed between Fraser's drafting of the e-mail, in February 2002, and the date on which he finally sent it to Yun, in May 2002, casts doubt on Fraser's subjective belief that the New York office's decision not to communicate its WorldCom strategy to other Fiduciary offices constituted a violation. Finally, Fraser's own explanation of his reason for sending the e-mail to Yun negates his argument that he was attempting to report fraud or misconduct: "I wanted Mr. Yun to recognize that a decision had been made by the New York office to unload the securities, didn't want him to think that—that we weren't doing our job." (Fraser Dep. at 232:15-18.) In other words, in light of the losses experienced by the Los Angeles office, Fraser sought to assure Fiduciary's President that he and his colleagues in New

York were making the right decisions.  (See id. at 232:22-24 ("So I wanted Mr. Yun to be aware that—that I was in keeping with Mr. Biggs's directive and that our group had sold positions….").)  This is a far cry from alerting an employer to a suspected fraud.

Likewise, Fraser's February 2003 conversation with Materasso about the UN AUM document is not protected activity.  Fraser's discussion with Materasso was merely a general inquiry: he raised questions about the document with Materasso, but he never expressed a specific concern that the information contained in the document was illegal.  In this respect, the present matter is analogous to the situation in Lerbs.  In that case, the plaintiff advised his superiors that he "did not think [the defendant company's accounting method] was right and that it was misleading."  Lerbs, 2004 DOLSOX LEXIS 65, at *32.  The Administrative Law Judge held that this did not constitute protected activity because the plaintiff "never identified particular concerns about [the defendant's] conduct…that he may have believed was illegal."  Id. at *34.  Furthermore, by his own admission, Fraser's concern about the impact of the document on shareholders was purely hypothetical: "If—this was to be shown to clients, it would be an overstatement of the—of the managed assets because it was included with all other accounts that we have a managed relationship."  (Id. at 308:1-6.)  But the UN AUM document was never disseminated to clients and, according to Fiduciary, was never intended for external use.

Moreover, even if the Court were to find that Fraser's two alleged instances of whistleblowing were protected activity under SOX § 806, and even accepting that his termination in March 2003 constituted an adverse employment action,[7] Fraser's SOX claim still

---

[7] The Court does not accept, however, that the other three acts identified by Fraser—moving his desk closer to Materasso's, relieving him of his client newsletter duties, and not inviting him to GIC meetings—constitute adverse employment actions.
> A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.  To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  A materially adverse change might be indicated by a

10

fails as a matter of law because he cannot demonstrate a causal connection between his protected activity and Fiduciary's decision to terminate his employment. With respect to the WorldCom bond e-mail, Fraser relies entirely on the temporal proximity between the e-mail, which he sent to Yun on May 16, 2002 (three months after he first drafted it), and his termination, which occurred on March 7, 2003. Although temporal proximity may play a role in establishing causation, "district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." Garrett v. Garden City Hotel, Inc., No. 05 Civ. 0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting cases). Thus, given the ten months that elapsed between Fraser's e-mail to Yun and his termination, Fraser cannot demonstrate the causation necessary to sustain his SOX claim.

As for Fraser's conversation with Materasso about the AUM document, which occurred roughly one month prior to his termination, this claim also fails due to its reliance on temporal proximity. "Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation. However, its presence does not compel a finding of causation, particularly when there is a legitimate intervening basis for the adverse action." Tice v. Bristol-Myers Squibb Co., 2006-SOX-20, 2006 WL 3246825, at *20 (U.S.D.O.L. Apr. 26, 2006). Here, the factual record indicates that the legitimate intervening basis for Fraser's termination was Fiduciary's determination that he was attempting

---

> termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices…unique to a particular situation.

Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (citations and quotation marks omitted). The three acts identified by Fraser do not meet this standard. The move of Fraser's desk is, at best, a mere inconvenience. Relieving him of his responsibility for the client newsletter might constitute an alteration of job responsibilities, but it certainly does not represent a significant diminution of those responsibilities. As for the GIC meetings, Materasso only invited Fraser to those meetings when he was told by his superiors that there was extra room available. In other words, attendance at those meetings was not a routine part of Fraser's employment in the first place, so the discontinuance of his attendance could hardly be considered an adverse employment action.

11

to establish an unauthorized hedge fund and market it to Fiduciary's clients.

For all of the foregoing reasons, the Court grants summary judgment to Defendants on Fraser's SOX § 806 claims.

## V.     ERISA Discriminatory Discharge Claim

ERISA § 510 provides that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant [in an ERISA-governed employee benefits plan]…for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…." 29 U.S.C. § 1140.

To succeed on a claim of discriminatory discharge pursuant to ERISA § 510, the plaintiff must demonstrate that the defendant employer terminated him in order to avoid its obligations under a benefits plan governed by ERISA.  Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988).  "There is…no cause of action under section 510 where the loss of…benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (quoting Dister, 859 F.2d at 1111).  Instead, the plaintiff must demonstrate that "the employer acted with the specific intent forbidden by the statute…." Vallone v. Banca Nazionale del Lavoro, Nos. 02 Civ. 6064 (RCC), 02 Civ. 7102 (RCC), 2004 WL 2912887, at *2 (S.D.N.Y. Dec. 14, 2004); see also Dister, 859 F.2d at 1111 ("Plaintiff is required to prove more than the single fact that his termination precluded him from vesting into the [plan]; he must demonstrate [the defendant employer's] unlawful purpose in firing him.").

Fraser's ERISA § 510 discriminatory discharge claim fails as a matter of law because he offers no facts in support of his bald assertion that Defendants "were determined to prevent Plaintiff from receiving existing and future benefits from…ERISA-governed Plans."  (Second

Am. Compl. ¶ 190.) Fraser neither identifies the ERISA benefits that he was allegedly deprived nor provides factual support for his allegation that denial of such benefits was a motivating factor in Fiduciary's decision to terminate him. Fraser merely submits, as evidence of the connection between his ERISA benefits and his termination, that his benefits were scheduled to vest in April 2003, one month after he was terminated. (See Transcript of Oral Argument on April 14, 2009 ("O.A. Tr.") 26:7-10.) This does not raise a genuine issue of material fact as to whether Fraser suffered a discriminatory discharge under ERISA § 510. See Dister, 859 F.2d at 1117 n.1 (holding that the temporal proximity between the date on which the plaintiff's benefits would vest and the date of his termination was insufficient "to create a genuine issue of fact requiring a trial"). A rational trier of fact could not conclude that Fiduciary fired Fraser in order to prevent him from receiving ERISA-governed benefits, as Fraser offers only speculation and unsupported conclusions in support of his position. Defendants are therefore entitled to summary judgment on this claim.

## VI.     Title VII, State, and City Law Racial Discrimination Claims

Fraser's racial discrimination claims, made pursuant to Title VII, the NYSHRL, and the NYCHRL, allege that Defendants discriminated against him by: (1) failing to promote him to portfolio manager; (2) creating a hostile work environment; and (3) terminating his employment.

### A.     Failure to Promote

To state a prima facie claim for failure to promote, the plaintiff must demonstrate that: "(1) [he] is a member of a protected class; (2) [he] applied and was qualified for a job for which the employer was seeking applicants; (3) [he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (citing

13

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

Fraser's failure to promote claim, which is premised on the London office's promotion of Atanas Christev to portfolio manager, fails as a matter of law. Fraser, an African-American, is a member of a protected group, and the Court accepts that he was qualified for the position of portfolio manager. Yet he never applied for the position in question and therefore was never rejected under circumstances that would give rise to an inference of racial discrimination. The London office, which never sought applications for the portfolio manager position, chose to fill that position with an employee who was already employed by Fiduciary in London and who was qualified for the job. Fraser raises no genuine issue of material fact that could lead a jury to conclude that the London office's reasonable decision was motivated by racial animus towards Fraser, an employee in New York. The mere fact that Fraser was qualified, and that he had expressed interest in obtaining a portfolio manager position, is insufficient to support this claim.

### B. Hostile Work Environment

To prove hostile work environment, the plaintiff must demonstrate: "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted). In evaluating a hostile work environment claim, it is appropriate to consider various factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Fraser's claims largely revolve around instances in which Fiduciary employees used

"street slang" when talking to him or, on some occasions, made insensitive remarks about African-Americans in his presence.  One employee, for example, is alleged to have referred to Fraser as "homey" or "cuz," suggested that African-Americans are lazy and on welfare, and made disparaging remarks about African-American women in Fraser's presence.  In one instance, Fraser alleges that Materasso called him a "nigger."  While none of this behavior can be condoned in the slightest, it is not sufficiently severe or pervasive to sustain a hostile work environment claim.  In Stembridge v. City of New York, 88 F. Supp. 2d 276 (S.D.N.Y. 2000), the court granted summary judgment to the defendant employer on the plaintiff employee's hostile work environment claim even though the factual record demonstrated that other employees had referred to the plaintiff as an "uppity nigger" and a "boy," called African-American youths "animals," called Mayor David Dinkins a "washroom attendant," and hung a black doll from a door in the office.  Id. at 279-80, 286.  Despite the severity of these discriminatory incidents, the court held that "seven instances over three years does not create a work environment permeated with racial hostility."  Id. at 286.  Fraser's allegations are much less severe than those made by the plaintiff in Stembridge, and they are less pervasive as well.  This is particularly true given that "mere utterance of an…epithet which engenders offensive feelings in an employee…does not sufficiently affect the conditions of employment to implicate Title VII."  Harris, 510 U.S. at 20.  While Materasso's remark may denote racial hostility, the other comments about which Fraser complains are more properly classified as offensive utterances that fall below the threshold of a Title VII hostile work environment claim.  See Stembridge, 88 F. Supp. 2d at 286 (distinguishing between statements that demonstrate racial hostility and those that are merely offensive).  Because Fraser cannot establish a prima facie claim of hostile work environment, Defendants are entitled to summary judgment.

15

### C. Discriminatory Discharge

"In order to establish a prima facie case of discriminatory discharge in violation of Title VII…a plaintiff must show (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

Defendants are entitled to summary judgment on Fraser's discriminatory discharge claim because Fraser cannot demonstrate circumstances surrounding his termination that give rise to an inference of discrimination. Yun made the decision to terminate Fraser's employment after consulting with Eisert, who had investigated Fraser's unauthorized hedge fund. Fraser fails to allege any facts that would lead a reasonable jury to conclude that either Yun or Eisert acted with discriminatory intent in deciding to fire Fraser. Materasso's racially offensive remark is inconsequential for the present claim because Fraser never alleges—nor could he credibly allege, given the factual record—that Materasso played any role in deciding to fire him. See James v. Newsweek, No. 96 Civ. 0393 (LAP), 1999 WL 796173, at *14 (S.D.N.Y. Sept. 20, 1999) (holding that a stray racial remark made by an individual who was not involved in decisions regarding the plaintiff's employment did not create a genuine issue of material fact as to whether the plaintiff's adverse employment action was racially-motivated).

Absent any factual allegations demonstrating racial motivation on the part of the decision-makers, Fraser is left merely with the fact that he is a member of a protected class. In other words, he "[does] little more than cite to [his] mistreatment and ask the court to conclude that it must have been related to [his] race. This is not sufficient." Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001).

16

**VII.   Common Law Breach of Contract Claim**

Under New York law, express language in an employee policy manual indicating that employees are terminable at will "prevents the creation of a contract and negates any protection from termination [the employee] may have inferred from the manual's no-reprisal provision." Lobosco v. N.Y. Tel. Co., 96 N.Y.2d 312, 316-17 (2001); see also Baron v. Port Auth. of N.Y. & N.J., 271 F.3d 81, 88 (2d Cir. 2001) (citing to Lobosco in support of its holding that "in light of the general clarity with which the disclaimers in the [Port Authority employee policy documents] disavow any contractual intent, the Port Authority clearly preserve[d] its rights as an at-will employer of the plaintiffs").

In Lobosco, the plaintiff employee alerted the defendant employer about allegedly unethical conduct occurring within the company and was fired shortly thereafter. 96 N.Y.2d at 314. He sued the defendant for breach of contract, relying on language in the defendant's policy manual that encouraged employees to report potential violations and indicated that they would not face retaliation. Id. at 315. The court granted summary judgment to the defendant on the grounds that the policy manual also contained express language indicating that the defendant reserved the right to terminate employees at will. Id. at 316. The court explained that "[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements….It would subject employers who have developed written policies to liability for breach of employment contracts upon the mere allegation of reliance on a particular provision. Clearly that cannot be, especially in light of conspicuous disclaiming language. An employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer." Id. at 317.

Fraser nonetheless asks the Court to find that Fiduciary's Policy Manual, which informed

17

employees that they would not face retaliation for reporting illegal conduct, constitutes a contract, and that his termination constituted a breach. Yet the Policy Manual also clearly states in its introductory section that that it "is not a contract to provide employees with permanent employment. Every employee's job is terminable at will by [Fiduciary], with or without cause." (Fraser Dep. Ex. Q. at iv.) As such, the present matter is on all fours with Lobosco. Because the Policy Manual contained express language preserving Fiduciary's right to terminate employees at will, Defendants' motion for summary judgment on Fraser's breach of contract claim must be granted.[8] This outcome is especially appropriate here, where the record demonstrates that Fraser was terminated not because of any complaints he made, but rather because of his promotion of an unauthorized hedge fund.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's Second Amended Complaint is DISMISSED. Defendants' motion to strike is DENIED as moot. The Clerk of the Court is directed to enter judgment and close this matter.

Dated: New York, New York
August 25, 2009

SO ORDERED

*Paul A. Crotty*
PAUL A. CROTTY
United States District Judge

---

[8] In his opposition papers, Fraser effectively abandons his breach of contract argument and in favor of an argument based on the doctrine of promissory estoppel. (See Pl.'s Mem. in Opp. to Motion for Summ. Judg. at 18-20.) "[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion." Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997). Furthermore, Fraser's sudden shift to a promissory estoppel theory cannot change the fact that the present matter is directly controlled by Lobosco, which defeats Fraser's claim.